**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4720**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

TIMOTHY A. WARD

Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Robert E. Payne, Senior District Judge. (3:18-cr-00044-REP-1)

Argued: October 30, 2019                                    Decided: August 20, 2020

Before GREGORY, Chief Judge, KEENAN, and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Richardson wrote the opinion, in which Judge Keenan joined. Chief Judge Gregory wrote an opinion concurring in the judgment.

**ARGUED:** Caroline Swift Platt, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Geremy C. Kamens, Federal Public Defender, Alexandria, Virginia, Valencia D. Roberts, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellant. G. Zachary Terwilliger, United States Attorney, Alexandria, Virginia, Heather Hart Mansfield, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

RICHARDSON, Circuit Judge:

In 2018, Timothy Ward pleaded guilty to one count of distributing cocaine in violation of 21 U.S.C. § 841. Because Ward was thrice before convicted of a felony "controlled substance offense," the district court applied a career-offender enhancement to Ward's sentence. U.S.S.G. § 4B1.1(a). As a result, Ward faced a Federal Sentencing Guidelines' range of 151 to 188 months' imprisonment—more than six times the 24 to 30 months Guidelines' range applicable without the enhancement. Ultimately, the district court imposed a sentence of 10 years' imprisonment.

According to Ward, his career-offender designation was erroneous. He argues that his two Virginia convictions for possession with the intent to distribute heroin do not qualify as controlled substance offenses under the Guidelines. In Ward's view, for a state conviction to qualify as a "controlled substance offense," the "controlled substances" covered under the state law of conviction must be coextensive with those listed in the federal Controlled Substances Act. And because Virginia law defines controlled substances more broadly than federal law, his Virginia conviction does not trigger the career-offender enhancement.

We disagree. Ward's Virginia convictions for possession with the intent to distribute heroin fall within the Guidelines' categorical definition of a "controlled substance offense." So we hold that Ward's two convictions under Va. Code § 18.2-248 each qualify as a "controlled substance offense" that may trigger the career-offender enhancement, and we affirm.

2

## I.  Background

This case arose from a straightforward "buy-bust" operation.  In 2017, an informant bought 0.1645 grams of cocaine from Ward.  Based on this controlled drug buy, Ward was arrested and indicted by federal prosecutors.  He pleaded guilty to the distribution of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

This was not Ward's first time selling drugs.  In 2001, he was convicted in federal court of possessing crack cocaine with the intent to distribute and sentenced to 84 months' imprisonment.  Within six months of release, Ward's supervised release was revoked.  Then, within nine months of his next release, Ward was again arrested for two heroin offenses in Virginia in violation of Va. Code § 18.2-248.  He was convicted of both offenses and released from imprisonment on those charges in 2014, less than three years before the cocaine sale that would lead to this appeal.

Based on these prior offenses, a federal probation officer designated Ward a "career offender" under § 4B1.1 of the Federal Sentencing Guidelines:  Ward was at least 18 years old when he committed this federal controlled substance offense in 2017, and he had "at least two prior felony convictions of a controlled substance offense."  J.A. 159.[1]  The

---

[1] A defendant is "a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense."  U.S.S.G. § 4B1.1(a).  A defendant who is a "career offender" under the Guidelines is assigned to Criminal History Category VI and given offense levels at or near the statutory maximum penalty of the offense of the conviction.  *See id.*

3

career-offender designation did not impact Ward's criminal-history category. But it did increase his base offense level from 12 to 32. After credit for accepting responsibility, Ward faced a Guidelines' range of 151 to 188 months' imprisonment, more than six times the 24 to 30 months that Ward would have faced without the enhancement.

At sentencing, Ward objected to the career-offender designation. He conceded that his prior federal conviction counted as a "controlled substance offense." But he argued that his two Virginia convictions were not predicate controlled substance offenses under the Sentencing Guidelines.

The district court rejected Ward's argument and found that Ward's two prior Virginia heroin convictions counted as "controlled substance offense[s]" triggering the career-offender enhancement. The district court then granted in part Ward's motion for a downward departure from the Guidelines' range and imposed a sentence of 10 years in prison followed by 3 years of supervised release. Ward timely appealed.

## II.    Discussion

We review a district court's sentencing decisions for abuse of discretion. *United States v. Torres-Reyes*, 952 F.3d 147, 151 (4th Cir. 2020). In doing so, we consider both the procedural and substantive reasonableness of a sentence. *Id.* Ward limits his appeal to the former, arguing that, because the district court improperly designated him a career offender, his sentence is procedurally unreasonable. *See Gall v. United States*, 552 U.S. 38, 51 (2007). Whether Ward's Virginia convictions count as "controlled substance offense[s]" that trigger the career-offender enhancement is a "legal issue we review de novo." *United States v. Dozier*, 848 F.3d 180, 182–83 (4th Cir. 2017).

4

We consider this question under the so-called "categorical approach." This approach is categorical in that we ask whether the offense of conviction—no matter the defendant's specific conduct—necessarily falls within the Guidelines' description of a "controlled substance offense." To do so, we set aside the particulars of Ward's actions underlying his convictions, focusing instead on "the fact of conviction and the statutory definition of the prior offense." *Id.* at 183 (quoting *United States v. Cabrera-Umanzor*, 728 F.3d 347, 350 (4th Cir. 2013)). We then compare the elements of the prior offense with the criteria that the Guidelines use to define a "controlled substance offense." *See Shular v. United States*, 140 S. Ct. 779, 783 (2020) (asking "whether the conviction meets [the relevant] criterion").[2]

---

[2] This approach is one of "two categorical methodologies." *Shular*, 140 S. Ct. at 783. The other entails "'a generic-offense matching exercise,'" when a court must come up with a "generic" version of a crime, determining "the elements of 'the offense as commonly understood.'" *Id.* at 783–84 (citing *Mathis v. United States*, 136 S. Ct. 2243, 2247 (2016)). Then it compares those elements to those of the state offense. *Id.* at 784. This second methodology is required for statutes that "refer[] generally to an offense without specifying its elements." *Id.* at 783; *see, e.g.*, *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1571 (2017) (identifying the "generic meaning of sexual abuse of a minor"); *Taylor v. United States*, 495 U.S. 575, 598–99 (1990) (identifying the elements of "generic burglary").

Ward does not argue that we must apply this second categorical methodology. Appellant Br. 3 ("The question in this case is not about the supposed 'generic offense' of 'controlled substance offenses.'"). Nor could he. Since § 4B1.2(b) specifies the requirements of a "controlled substance offense," "no identification of generic offense elements [is] necessary." *Shular*, 140 S. Ct. at 783.

In Ward's case, this approach requires us to identify the elements of the Virginia law of conviction and the criteria the Federal Sentencing Guidelines use to define a "controlled substance offense." And we ask whether the two categorically match.[3]

Ward was convicted of violating Virginia Code § 18.2-248, which makes it "unlawful for any person to manufacture, sell, give, distribute, or possess with intent to manufacture, sell, give or distribute a controlled substance or an imitation controlled substance." Ward does not dispute that the elements of a violation of § 18.2-248 require proving that the defendant committed one of the actions—manufacture, sell, give,

---

[3] As we ultimately find that Ward's state offense categorically matches, we need not address the alternative "modified categorical approach," *see Cucalon v. Barr*, 958 F.3d 245, 251–53 (4th Cir. 2020); *Bah v. Barr*, 950 F.3d 203, 208–10 (4th Cir. 2020), which is "a variant" of the "categorical approach." *Descamps v. United States*, 570 U.S. 254, 257 (2013).

Chief Judge Gregory claims that, by failing to address that issue, we have "ignore[d] our recent precedent and create[d] an entirely new framework that requires us to split from several of our sister circuits," Concurrence 18–19, and have "turn[ed] the modified categorical approach into an exception to the categorical approach—not a tool," *id.* at 23. In doing so, Chief Judge Gregory mischaracterizes our use of the word "alternative" and skates past the differences in the federal comparators reviewed in *Bah* and *Cucalon*. The Supreme Court recently explained the "two categorical methodologies" in *Shular*, 140 S. Ct. at 783. Since the Guidelines provision asks us "to determine not whether the prior conviction was for a certain offense, but whether the conviction meets some other criterion, . . . we simply ask[] whether . . . [Ward's] prior conviction[] before us [meets] that measure." *Shular*, 140 S. Ct. at 783. If so, then we need not address the modified categorical approach. *See Cucalon*, 958 F.3d at 250 (describing the modified categorical approach as applying when the state law was not a categorical match); *Bah*, 950 F.3d at 206–07 (turning to the modified categorical approach after finding the statute covers conduct not covered by the federal comparator); *see also United States v. Allred*, 942 F.3d 641, 649 (4th Cir. 2019) (applying the modified categorical approach where the government correctly conceded that the conviction could not satisfy the categorical approach).

distribute, or possess with intent to manufacture, sell, give, or distribute—with an identified controlled substance. *See Cucalon*, 958 F.3d at 251.

The key question for our consideration is whether these elements categorically meet the criteria that the Guidelines use to define a "controlled substance offense." We interpret the Sentencing Guidelines using our ordinary tools of statutory construction. *United States v. Rouse*, 362 F.3d 256, 262 (4th Cir. 2004). And "[a]s in all statutory construction cases," we start with the plain text of the Guidelines and "'assume that the ordinary meaning of [the statutory] language'" controls. *Marx v. General Revenue Corp.*, 568 U.S. 371, 376 (2013) (quoting *Hardt v. Reliance Standard Life Insurance Co.*, 560 U.S. 242, 251 (2010)); *see Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).

Section 4B1.2(b) of the Guidelines defines a "controlled substance offense" as:

> [A]n offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

First, we note that only an "offense under federal or state law" may trigger the enhancement. An "offense" is, of course, "a breach of law." *Offense*, 10 Oxford English Dictionary 724 (2d ed. 1989); *Offense*, Black's Law Dictionary 1300 (11th ed. 2019) ("a violation of the law; a crime"). The noun, "offense," is then modified by a prepositional phrase: "under federal or state law." § 4B1.2(b). The preposition "under" means "[b]eneath the rule or domination of; subject to." *Under*, 18 Oxford English Dictionary

7

949 (2d ed. 1989).[4] So to satisfy the ordinary meaning of "offense," there must be a violation or crime "subject to" either "federal or state law."

This "offense under federal or state law" must satisfy two criteria: (1) the offense must be "punishable by imprisonment for a term exceeding one year" and (2) the federal or state law must (a) prohibit the manufacture, import, export, distribution, or dispensing of a controlled substance, or (b) prohibit the possession of a controlled substance with intent to manufacture, import, export, distribute, or dispense. § 4B1.2(b).

The first criterion, "punishable by imprisonment for a term exceeding one year," requires the maximum sentence for the "offense" to be more than one year. To determine whether the "offense" has a maximum sentence of more than one year, we look to possible penalties for that offense as provided by the relevant "federal or state law" of conviction. Virginia Code § 18.2-248 is punishable by imprisonment "for not less than five nor more than 40 years" for the first conviction and up "to imprisonment for life or for any period

---

[4] In his concurrence, Chief Judge Gregory agrees with this basic meaning: this provision "necessarily refers to a set of substances subject to the control of some government." Concurrence 26. Even so he questions why we "primarily rely on dictionaries . . . as authoritative sources on a text's plain meaning." Concurrence 27. Dictionaries, like other interpretative tools, require careful use and healthy skepticism. Even so, they are a common and useful interpretive tool. *See Blakely v. Wards*, 738 F.3d 607, 611 (4th Cir. 2013) (en banc) ("To interpret statutory language . . . we begin our analysis with the plain language," and, "[i]n beginning with the language itself, we customarily turn to dictionaries for help in determining whether a word in a statute has a plain or common meaning") (internal quotations omitted). And here Chief Judge Gregory's own interpretation tracks the common dictionary definitions. *Compare* Concurrence 26, *with* Black's Law Dictionary 417 (11th ed. 2019) (*Controlled Substance* is "any type of drug whose manufacture, possession, and use is regulated by law"). The root of the Chief's disagreement appears not to be our use of dictionaries to interpret the text, but our reliance on the text itself.

8

not less than five years" for a second conviction. Thus, an offense under § 18.2-248 satisfies the first criterion.

The second criterion addresses certain prohibited acts, like the distribution of a controlled substance. The prohibited *actions* follow their readily apparent meaning. *See*, *e.g.*, *Distribution*, 4 Oxford English Dictionary 868 (2d ed. 1989) ("[T]he action of dividing and dealing out or bestowing in portions among a number of recipients; apportionment, allotment."); *Distribution*, Black's Law Dictionary 597 (11th ed. 2019) ("The act or process of apportioning or giving out."). And the ordinary meaning of the object of the prohibited actions, "controlled substance," is "*any type of drug* whose manufacture, possession, and use is *regulated by law*." *Controlled Substance*, Black's Law Dictionary 417 (11th ed. 2019) (emphasis added).[5]

Here, the state law, Virginia Code § 18.2-248, satisfies this second criterion of § 4B1.2(b). First, consider the statute's prohibited actions. Section 18.2-248 makes it "unlawful for any person to manufacture, sell, give, distribute, or possess with intent to manufacture, sell, give or distribute a controlled substance." § 18.2-248(A). In one sense, by excluding "import [or] export," § 18.2-248's prohibited actions are narrower than those defined by § 4B1.2(b). But an offense that prohibits a narrower set of actions categorically qualifies. *See, e.g.*, *Bah*, 950 F.3d at 206. Although § 18.2-248 uses the terms "sell" and

---

[5] *See also Controlled*, 3 Oxford English Dictionary 853 (2d ed. 1989) ("Held in check, restrained, dominated."); *Substance*, 17 Oxford English Dictionary 65 (2d ed. 1989) ("A species of matter of a definite chemical composition.").

9

"give," where § 4B1.2(b) does not, they fall within the plain meaning of "distribution" or "dispensing" in § 4B1.2(b).[6]

Second, consider the objects of those prohibited actions. *See* Va. Code § 54.1-3401 (A "controlled substance" under Virginia law is defined as "a drug, substance, or immediate precursor in Schedules I through VI of this chapter" and "includes a controlled substance analog that has been placed into Schedule I or II by the Board [of Pharmacy] pursuant to the regulatory authority in subsection D of § 54.1-3443").[7] The state has not restricted itself to regulating only those substances listed on the federal drug schedules. Instead, the offense identifies those substances that are "regulated" under Virginia law, which has its own drug schedules. So a conviction under § 18.2-248 categorically satisfies

---

[6] Start with the terms in the Sentencing Guidelines. The verb "distribute" means "[t]o deal out or bestow in portions, or shares among a number of recipients; to allot or apportion as his share to each person of a number." *Distribute*, 4 Oxford English Dictionary 867 (2d ed. 1989). To "dispense" similarly means "[t]o mete out, deal out, distribute." *Dispense*, 4 Oxford English Dictionary 809 (2d ed. 1989).

Next, take the terms in the Virginia statute. When a person *gives* an item, he is "mak[ing] another the recipient of [the item] (something that is in the possession, or at the disposal, of the subject)." *Give*, 6 Oxford English Dictionary 535 (2d ed. 1989). And when a person *sells* an item, he is also "giv[ing] up or hand[ing] over (something) to another person for money (or something that is reckoned as money); esp[ecially] to dispose of (merchandise, possessions, etc.) to a buyer for a price." *Sell*, 14 Oxford English Dictionary 935 (2d ed. 1989).

So when a person sells heroin to another person for cash, he receives the money and gives, distributes, and dispenses the drug to the paying customer.

[7] Virginia Code § 18.2-247(A) specifies that the term "controlled substances" refers to the Virginia Drug Control Act, § 54.1-3400 *et seq*.

10

the second criterion of § 4B1.2(b), just as it does the first. And since both criteria are met, a conviction under § 18.2-248 is a "controlled substance offense" under § 4B1.2(b).[8]

Despite the plain language of § 4B1.2(b), Ward argues that a prior state offense qualifies as a "controlled substance offense" only where the state offense defines "controlled substance" just as federal law does in the Controlled Substances Act, 21 U.S.C. § 802(6). In Ward's view, because Virginia law prohibits a broader set of substances than federal law, Virginia Code § 18.2-248 is overbroad and fails to categorically qualify as a "controlled substance offense." *See Mellouli v. Lynch*, 135 S. Ct. 1980, 1986 (2015).

We disagree. As described above, Ward's argument ignores the plain meaning of § 4B1.2(b). A predicate offense arises under *either* "federal *or* state law" if it satisfies the two criteria: (1) the offense is punishable by at least one year's imprisonment; and (2) the law prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or the possession with the intent to do so). And, as we described, to determine whether the offense meets the first criterion, we look to the law of the jurisdiction of the

---

[8] To illustrate, analyzing Ward's 2001 federal crack-cocaine conviction—which the parties agree is a "controlled substance offense" under the Guidelines—requires asking whether the same two criteria are met: (1) an offense punishable by imprisonment for more than one year; and (2) arising under a federal or state law prohibiting certain actions—like distribution of a controlled substance. And we would do so by looking to the *federal* law defining his 2001 federal conviction. Ward's prior federal offense arises under 21 U.S.C. § 841(a)(1), which is punishable by imprisonment for more than one year (and therefore categorically satisfies the first criterion). *See id.* § 841(b). And § 841(a)(1) categorically satisfies the second criterion, prohibiting the same actions with the same object enumerated in § 4B1.2. *See id.* § 841(a)(1) (unlawful "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance"); *id.* § 802(6) ("The term 'controlled substance' means a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter" in the federal Controlled Substances Act.).

11

conviction. We do not look to an analogous federal statute to determine whether a state offense is punishable by more than one year in prison. Nor do we look to a federal statute to determine whether the offense satisfies the second criterion. Where a defendant is convicted under a state statute, we look to see how the state law defining that offense defines the punishment and the prohibited conduct (*e.g.*, distribution of a controlled substance).

We have rejected an argument much like Ward's before, refusing to limit § 4B1.2(b) to state offenses that define substances just as federal law defines them. In *United States v. Mills*, the district court found that a state conviction for the "possession with intent to distribute look-a-like controlled dangerous substances" under Maryland law qualified as a "controlled substances offense." 485 F.3d 219, 222 (4th Cir. 2007). Section 4B1.2 includes as a "controlled substance offense" an "offense under federal or state law . . . that prohibits . . . the possession of a controlled substance (or *counterfeit substance*) with intent to . . . distribute." § 4B1.2(b) (emphasis added). Mills argued that only a state offense prohibiting the distribution of "counterfeit substances" as defined under the federal Controlled Substances Act, 21 U.S.C. § 802(7), qualified as a predicate offense.

We rejected Mills's argument that we must look to the federal Controlled Substances Act's definition—a reference that is notably absent from this Guidelines provision. 485 F.3d at 223. Instead, we concluded that the ordinary meaning of "counterfeit substance" controlled: a "substance 'made in imitation of' a controlled substance is a 'counterfeit substance.'" *Id.* at 222 (citing 3 *Oxford English Dictionary* 1027 (2d ed. 1989)). And we then looked to the Maryland law under which Mills was convicted.

12

*Id.* In doing so, we held that Maryland's look-a-like offense categorically satisfied this ordinary meaning: the Maryland statute "punishes persons who distribute, attempt to distribute, or possess with intent to distribute a non-controlled substance 'made in imitation' of a controlled dangerous substance." *Id.* The same is true here.[9]

And the structure of the Guidelines confirms this conclusion. The Sentencing Commission devised "a veritable maze of interlocking sections and statutory cross-references." *Id.* at 219. For example, § 2D1.1 gives the framework for sentencing drug-related offenses, setting the offense level based on different criteria. And those criteria include explicit references to federal statutes and other federal Guidelines provisions. *See* U.S.S.G. § 2D1.1 (a), (b)(3), (b)(16), (b)(18), (d)(1); *see also id.* § 2D1.1 (application note 6) (defining "'analogue,' for purposes of this guideline, [to] ha[ve] the meaning given the term 'controlled substance analogue' in 21 U.S.C. § 802(32)").

Section 4B1.2, the provision we address today, also explicitly references other Guidelines provisions and federal statutes. That provision "defines 'crime of violence' to include unlawful possession of a firearm *as described in 26 U.S.C. § 5845(a)*." *Mills*, 485 F.3d at 223 (emphasis added); *see also* U.S.S.G. § 4B1.2 (application note 1). But § 4B1.2 refers neither to the federal definition of a "controlled substance" nor to the federal drug schedules. Yet we know the Commission understood how to cross-reference other federal

---

[9] While *Mills* never explicitly announced that it was applying the "categorical approach," it applied the methodology underlying that approach: We identified the criterion for a "controlled substance offense" in § 4B1.2(b) and "simply asked whether . . . [Mills's] prior conviction[] before us met that measure." *Shular*, 140 S. Ct. at 783 (describing the categorical approach); *Mills*, 485 F.3d at 222.

13

provisions and definitions. *See Mills*, 485 F.3d at 223. If the Commission had intended for the federal definition of "controlled substance" to apply for the career-offender enhancement, "it had only to say so." *Id.* at 223. Like the Seventh Circuit, "[w]e see no textual basis to engraft the federal Controlled Substances Act's definition of 'controlled substance' into the career-offender guideline." *United States v. Ruth*, __ F.3d __, 2020 WL 4045885, at *10 (7th Cir. July 20, 2020).

Ward asks us to depart from *Mills* and apply the *Jerome* presumption. Under this presumption, we "generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Jerome v. United States*, 318 U.S. 101, 104 (1943). "That assumption is based on the fact that the application of federal legislation is nationwide . . . and at times on the fact that the federal program would be impaired if state law were to control." *Id.*

We have cited this presumption when interpreting federal statutes, as has the Supreme Court. *See, e.g.*, *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989) (interpreting the term, "domicile," in the Indian Child Welfare Act, 25 U.S.C. § 1911); *Federal Reserve Bank of Richmond v. City of Richmond*, 957 F.2d 134, 135 (4th Cir. 1992) (interpreting the phrase, "taxes upon real estate," in 12 U.S.C. § 531).[10] The

---

[10] Because the *Jerome* presumption is overcome here, we need not determine whether the presumption for Acts of Congress extends to Guidelines promulgated by the U.S. Sentencing Commission ("an independent commission in the judicial branch of the United States," 18 U.S.C. § 991(a)). *See United States v. Townsend*, 897 F.3d 66, 71 (2d Cir. 2018) (applying the *Jerome* presumption to the Guidelines because, "[a]lthough not a (Continued)

14

*Jerome* presumption, however, is only a presumption; it gives way to "a plain indication" that the application of federal law depends on state law. *Jerome*, 318 U.S. at 104; *see also Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983). In other words, "'[t]here are, of course, instances in which the application of certain federal [law] may depend on state law. . . . But this is controlled by the will of Congress.'" *N.L.R.B. v. Natural Gas Utility District*, 402 U.S. 600, 603 (1971) (quoting *N.L.R.B. v. Randolph Electric Membership Corp.*, 343 F.2d 60, 62 (4th Cir. 1965)).

Assuming the *Jerome* presumption should be applied to Guidelines promulgated by the Sentencing Commission, we are confident that it is overcome here. Section 4B1.2(b) disjunctively refers us to state law in defining the offense: "The term 'controlled substance offense' means an offense under federal *or state law*." § 4B1.2(b) (emphasis added). Thus, the Commission has specified that we look to *either* the federal or state law of conviction to define whether an offense will qualify. And this directive is confirmed by the structure of the Sentencing Guidelines. *See Mills*, 485 F.3d at 223; *see also Jerome*, 318 U.S. at 106 ("[W]hen Congress has desired to incorporate state laws in other federal penal statutes, it has done so by specific reference or adoption."). In the face of these clear textual and structural expressions, we cannot now cabin the career-offender enhancement as Ward suggests. Doing so is "beyond our purview as a court and properly remains the domain of

---

federal statute, the Guidelines are given the force of law . . . and arguably have an even greater need for uniform application").

15

either the Sentencing Commission or the Congress." *United States v. Maroquin-Bran*, 587

F.3d 214, 217 (4th Cir. 2009).[11]

Thus, Ward's two convictions under Virginia Code § 18.2-248 categorically qualify under the ordinary meaning of "controlled substance offense" in §4B1.2(b). And the district court correctly counted those convictions as predicate offenses for the career-offender enhancement.[12]

---

[11] Chief Judge Gregory points us to the commentary accompanying § 4B1.2(b) as another "reason[] to think that 'controlled substance' does not incorporate substances solely controlled under state law." Concurrence 32. Although the commentary refers solely to federal statutes, it is not an exhaustive list, as Chief Judge Gregory concedes. Nor could it be. Limiting "controlled substance offense[s]" to those under federal law would render the phrase "under . . . state law" superfluous. § 4B1.2(b). *See Yates v. United States*, 574 U.S. 528, 543 (2015) ("We resist a reading of § 1519 that would render superfluous an entire provision passed in proximity as part of the same Act."); *United States v. Ivester*, 75 F.3d 182, 185 (4th Cir. 1996) ("[W]e are reluctant to interpret statutory provisions so as to render superfluous other provisions within the same enactment.").

We refuse to adopt such an interpretation that ignores the plain language of the Guidelines, which classifies "an offense under federal *or state law*" as a "controlled substance offense." § 4B1.2(b) (emphasis added). Such an interpretation "makes no sense in the context of the career offender Guidelines." *Mills*, 485 F.3d at 224. Despite the general goal of "reasonable uniformity in sentencing," Concurrence 28–29 (quoting U.S.S.G. ch. 3, pt. A1), the career-offender enhancement expressly depends on state law. In doing so, it treats offenders in different states differently. To the extent that one looks for "purpose," the career-offender *enhancement* is designed "to provide longer sentences for persons who are repeatedly convicted of violent or drug-related offenses" under either federal or state law. *Mills*, 485 F.3d at 224 (citing § 4B1.1 (background)). *See generally* Joshua M. Divine, *Statutory Federalism and Criminal Law*, 106 VA. L. REV. 127 (2020).

[12] The Second Circuit has held to the contrary: that "federal law is the interpretative anchor to resolve the ambiguity at issue here," the meaning of "controlled substance" in § 4B1.2(b). *Townsend*, 897 F.3d at 71. But *Townsend*'s singular focus on the phrase, "controlled substance," fails to acknowledge that the question is whether a defendant's prior conviction is an "offense" that meets the criteria set forth in § 4B1.2(b): (1) the offense has a maximum imprisonment of more than one year; and (2) arises under a law prohibiting the manufacture, distribution, or dispensing of a controlled substance or the (Continued)

\*      \*      \*

After Ward pleaded guilty to distributing cocaine, the district court applied the career-offender enhancement based on his prior "controlled substance offense" convictions. That was a correct application of §§ 4B1.1 and 4B1.2. The judgment of the district court is therefore

*AFFIRMED.*

---

possession of a controlled substance with the intent to manufacture, distribute, or dispense. The context and placement of the phrase, "controlled substance," as part of the description of the criteria for "an offense under federal or state law," removes any ambiguity. *Id.*

GREGORY, Chief Judge, concurring in judgment:

Earlier this year, we held that Virginia Code § 18.2–250, the section governing possession of controlled substances, was "divisible by substance" and applied the modified categorical approach to conclude that a Virginia possession conviction was a predicate controlled substance offense. *Bah v. Barr*, 950 F.3d 203 (4th Cir. 2020). A few months later, following the divisibility analysis in *Bah*, we held that "the identity of the prohibited substance is an element of Virginia Code § 18.2–248," and applied the modified categorical approach to conclude that a Virginia distribution conviction was a predicate controlled substance offense. *Cucalon v. Barr*, 958 F.3d 245, 252 (4th Cir. 2020). Collectively, these cases began the process of providing a straightforward framework for analyzing whether controlled substance offenses in Virginia may serve as predicate offenses during sentencing: apply the modified categorical approach and permit the state conviction to serve as a predicate offense if the *Shepard* documents show that the identity of the substance was also illegal under federal law.

Not anymore. Rather than following *Bah* and *Cucalon* to conclude that Ward's heroin conviction under Virginia Code § 18.2–248 satisfies the modified inquiry and, thus, qualifies as a controlled substance offense, the majority ignores our recent precedent and creates an entirely new framework that requires us to split from several of our sister

18

circuits.[1] This framework is unnecessary and unjustified.[2] Thus, while I agree with the

judgment reached today, I cannot follow the majority in the path it takes to get there.

---

[1] "Absent an en banc overruling or a superseding contrary decision of the Supreme Court, we, as a circuit panel, are bound by these precedents." *United States v. Prince-Oyibo*, 320 F.3d 494, 498 (4th Cir. 2003) (internal citation omitted).

[2] Not only does the majority err in not applying the modified categorical approach—the majority also errs in the version of the categorical methodology that applies here. The majority correctly notes that after this case was argued, the Supreme Court clarified that there are "two categorical methodologies." Maj. Op. at 5 n.2 (citing *Shular v. United States*, 140 S. Ct. 779, 783 (2020)). But then, consistent with its general approach, the majority limits the reach of Ward's argument based on a single, isolated sentence from Ward's Reply Brief: "The question in this case is not about the supposed 'generic offense' of 'controlled substance' offenses." See Maj. Op. at 5 n.2 (quoting Pet. Rep. Br. at 3). From this, the majority concludes that Ward is not asking that we apply the generic matching exercise common in many cases, but instead asking that we apply an approach that focuses on conduct—i.e. what the Supreme Courts calls "the *Kawashima* categorical approach." There are several reasons we cannot draw this inference.

First, we cannot expect Ward to have had the precognition to predict the Supreme Court's recent sorting of the categorical approaches.

Second, the quoted language from Ward's brief is raised in the context of emphasizing that the primary dispute in this case is about the meaning of "controlled substance" and not "controlled substance offense." Thus, a few lines earlier, Ward writes: "As an initial matter, the phrase 'controlled substance' does not refer to an offense at all, generic or otherwise." The point of Ward's statement is to point out that "controlled substance," which is undefined under the Guidelines, should be defined by the federal schedules. And the categorical approach should be used to determine whether the state schedule matches the federal schedules when determining if the state offense may serve as an adequate predicate offense under the Guidelines. *See, e.g.*, *United States v. Townsend*, 897 F.3d 66, 71 n.4, 72–74 (2d Cir. 2018) (explaining that we need not "decipher the generic definition" to compare prior state convictions to their corresponding federal crime).

Third, Ward does not appeal to *Kawashima* at all. Indeed, *Kawashima* is not cited in either of Ward's briefs. Instead, Ward consistently asks us to follow the Supreme Court's approach in *Esquivel-Quintana* and *Taylor*, the two cases that the majority cites as paradigmatic examples of applying the generic categorical approach. *See* Maj. Op. at 5 n.2 (citing examples of cases applying the "second methodology"); *see also*, Pet. Br. at 16 (Continued)

I.

It doesn't take much to resolve this case. We previously held that the same statute at issue here, Virginia Code § 18.2–248, is divisible by the identity of the controlled substance. *Cucalon*, 958 F.3d at 248 ("Upon our review, we conclude that Virginia Code § 18.2–248 is divisible by prohibited substance."). And our precedent tells us that, when analyzing whether something qualifies as a predicate offense under the Guidelines, the

---

("But that approach—deferring to common use of language and therefore states' definitions for a federal sentencing enhancement—was rejected by the Supreme Court in *Taylor* [] and violates well-established principles of statutory construction."); Pet. Rep. Br. at 9 ("This Court should reject the 'everyday meaning' argument here just as soundly as the Supreme Court did in *Esquivel-Quintana*.").

Finally, the application of the conduct-based approach is unlikely here given the language of the Guidelines. It is true that, as in *Shular*, the dispute is over whether a state drug offense ought to serve as a predicate offense for enhancement. But a distinguishing feature of conduct-based approaches is that they "speak[] of activities a state-law [] offense 'involves.'" *Shular*, 140 S. Ct. at 785; *see also*, *Kawashima v. Holder*, 565 U.S. 478, 483–84 (2012) (noting the statutory phrase "refers more broadly to offenses that 'involv[e]' fraud or deceit—meaning offenses with elements that necessarily entail fraudulent or deceitful conduct," and is "not limited to offenses that include fraud or deceit as formal elements"). As the Supreme Court states, "by speaking of activities a state-law drug offense 'involv[es],' § 924(e)(2)(A)(ii) suggests that the descriptive terms immediately following the word 'involving' identify conduct." *Shular*, 140 S. Ct. at 785. But "the word 'is' indicates a congruence between 'crime' and the terms that follow, terms that are also crimes." *Id.* Like the word "is," the word "means" in § 4B1.2(b) indicates congruence between an offense and the terms that follow. Thus, it would be unnatural to read § 4B1.2 as identifying conduct. *Shular* does not alter our precedent requiring that we match the elements of state drug offenses to their federal counterpart in these cases where the Guidelines indicate congruence. Indeed, we have stated that this is the correct application of the categorical approach in post-*Shular* drug cases. *See, e.g.*, *Cucalon*, 958 F.3d at 250 ("Under this framework, we compare the federal definitions of 'drug trafficking crime' and crime 'relating to a controlled substance' to the elements of the relevant state offense. If the elements of the state offense 'correspond in substance to the elements' of the federal definition, without consideration of the individual's underlying conduct, the state conviction is a categorical 'match' to the federal definition. (internal citations omitted)).

threshold inquiry is to determine whether the categorical approach *or* the modified categorical approach is applicable. *See United States v. Allred*, 942 F.3d 641, 647 (4th Cir. 2019) ("At the outset, we must determine which of the two modes of analysis the Supreme Court has approved in this context applies to the instant case. Specifically, we must choose between the 'categorical approach' and the 'modified categorical approach.'"). How do we know which approach is warranted? We look at the statute at issue. The "'first task' is 'to determine whether its listed items are elements,' thus rendering the statue divisible, 'or means,' thus rendering it indivisible." *Id.* at 649 (quoting *Mathis v. United States*, 136 S. Ct. 2243, 2256 (2016)). "Where the criminal statute at issue is indivisible . . . we are bound to apply the categorical approach." *Id.* at 647. "Alternatively, the modified categorical approach applies where the prior conviction at issue is for violation of a 'divisible' statute." *Id.* at 648.

Importantly, the modified categorical approach is not an *exception* to the categorical approach—that is, it is not what one turns to when the categorical approach fails. *See Descamps v. United States*, 570 U.S. 254, 263 (2013) ("The modified approach thus acts not as an exception, but instead as a tool."). Rather, the approach "merely helps implement the categorical approach when a defendant was convicted of violating a divisible statute." *Id.* Thus, "[c]ourts examining a divisible statute employ the 'modified categorical approach,' which entails an examination of a 'limited class of documents . . . to determine what crime, with what elements, a defendant was convicted of.'" *Bah*, 950 F.3d at 206 (internal citations omitted). Its application here is straightforward. Because our precedent tells us Virginia Code § 18.2–248 is divisible by substance, we look to the *Shepard*

21

documents to determine that Ward was convicted of a felony heroin offense under the statute as an adult. Since heroin is also a substance controlled under federal law, Ward's conviction satisfies the modified categorical inquiry.[3] Case closed.

## II.

So how does the majority manage to evade the framework set by our precedent? Its recognition of *Bah* and *Cucalon* comes in a footnote, where the majority appears to acknowledge that those cases apply the modified categorical approach in similar circumstances. Maj. Op. at 6 n.3. It is true that *Bah* and *Cucalon* addressed the Virginia drug statute in the context of the Immigration and Nationality Act, not the Guidelines. But that only changes what we are comparing the divisible statute against—it does not change the divisibility of the statute. Since we are starting with a divisible statute, our analysis calls for the modified categorical approach. Put differently, we noted in *Bah* and *Cucalon* that the identity of the controlled substance is an *element* of a Virginia Code § 18.2–248 offense. And since the categorical approach requires us to compare elements, the identity of the controlled substance ought to be part of what we compare when we analyze offenses under Virginia Code § 18.2–248. By not applying the modified categorical approach, the

---

[3] *See United States v. Sanchez-Garcia*, 642 F.3d 658, 661–62 (8th Cir. 2011) (applying the modified categorical approach to determine whether a state conviction was a "controlled substance offense" under the Guidelines); *see also United States v. Leal-Vega*, 680 F.3d 1160, 1166 (9th Cir. 2012) (applying the modified categorical approach to determine whether a state conviction was a "drug trafficking offense" under the Guidelines); *United States v. Gomez-Alvarez*, 781 F.3d 787, 793 (5th Cir. 2015) (same).

majority ignores our previous holding that the identity of a drug is an element of a Virginia Code § 18.2–248 offense.

The majority's explanation for why the modified categorical approach does not apply here is brisk. The majority declares: "As we ultimately find that Ward's state offense categorically matches, we need not address the alternative 'modified categorical approach.'" *Id.* (citing *Bah* and *Cucalon*). Okay. But that turns the modified categorical approach into an exception to the categorical approach—not a tool. *Cf. Descamps*, 570 U.S. at 263 ("The modified approach thus acts not as an exception, but instead as a tool."). This brief statement from the majority suggests that, in analyzing whether something is a predicate offense, courts may get two bites at the apple: try to apply the categorical approach and—only if that test fails—move on to the modified categorical approach.

This is a mistake. Our precedent is quite clear that once we determine that a statute is divisible, the modified categorical approach applies. *See, e.g.*, *Bah*, 950 F.3d at 206 ("Courts examining a divisible statute employ the 'modified categorical approach.'"); *id.* at 207 ("Thus, [t]he first task for a . . . court faced with an alternatively phrased statute is . . . to determine whether its listed items are elements or means. If they are elements, the court applies the modified categorical approach.") (internal citations omitted); *Allred*, 942 F.3d at 652 ("Because § 1513(b)(1) sets forth alternative elements by which witness retaliation may be committed and is thus divisible, *we must apply the modified categorical approach* to determine which of the alternative crimes formed the basis for [Petitioner]'s conviction.") (emphasis added). And this makes sense. A divisible statute "lists multiple, alternative elements, and so effectively creates 'several different . . . crimes.'" *Descamps*,

23

570 at 264 (quoting *Nijhawan v. Holder*, 557 U.S. 29, 41 (2009)). By applying the categorical approach to a divisible statute, one lumps together those different crimes when effectuating the categorical analysis. Stating that we "need not" apply the "alternative" modified categorical approach because the categorical approach is sufficient puts the cart before the horse. The divisibility of a statute is our starting point in the categorical analysis—not where we turn when there's nothing left. Because Virginia Code § 18.2–250 sets forth alternative elements by which a controlled substance offense may be committed and is thus divisible, "we *must* apply the modified categorical approach to determine which of the alternative crimes formed the basis for [Ward]'s conviction." *Allred*, 942 F.3d at 652 (emphasis added).[4]

---

[4] Replying to this point, the majority does not deny that our prior decisions held that the identity of the drug is an element of Virginia Code § 18.2–248. Rather, the majority doubles down and repeats that, despite dealing with a divisible statute, "we need not address the modified categorical approach." Maj. Op. at 6 n. 3. Unless the majority is suggesting that the modified categorical approach has no part in the conduct-based version of the categorical approach the majority applies, it is tough to see the support for this position. To the extent that *Bah* and *Cucalon* suggests that we only turn to the modified categorical approach when the categorical approach fails, it is inconsistent with our prior precedent that we *must* apply the categorical approach to a divisible statute. Since *Allred* precedes these cases, it is the controlling law of our circuit. *See McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) ("When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting en banc or the Supreme Court."). It's one thing to say that the modified approach would not make a difference here, it's quite another to say it does not apply. The divisibility of Virginia Code § 18.2–248 compels us to apply the modified categorical approach.

III.

The failure to apply the modified categorical analysis when our precedent demands its application is, in itself, enough to reject the majority's approach. Still, the majority compounds its error by misapplying the precedent it relies on when creating its new framework. When examining whether a controlled substance offense is a categorical match under Va. Code § 18.2–248 and the Guidelines, the majority depends heavily on our prior decision in *United States v. Mills*, 485 F.3d 219 (4th Cir. 2007), to support its introduction of the "plain meaning approach" to the categorical analysis. *See* Maj. Op. at 11–14. But this raises a few issues. First, *Mills* never purports to use the categorical approach—indeed, the phrase "categorical approach" is entirely absent from the opinion. Thus, incorporating *Mills*'s plain meaning approach into the categorical analysis is unsupported. The majority, that is, fails to show how *Mills* provides the footing for its new framework, which purports to apply the plain meaning *and* categorical approach to determine the scope of a "controlled substance offense."

Second, the phrase "counterfeit substance," which was the subject in *Mills*, is easily distinguishable from "controlled substance." As some of our sister circuits have noted, "counterfeit" has an ordinary, independent meaning, whereas "controlled" does not. *See, e.g.*, *Leal-Vega*, 680 F.3d at 1166–67 (9th Cir. 2012) ("The word 'counterfeit' has a normal, everyday meaning that we all understand[.] The same is not true of the word 'controlled.'"). The adjective "counterfeit" ordinarily means "[m]ade in imitation of something else . . . not genuine." *Mills*, 485 F.3d at 222. Hence, we can define "counterfeit substance" independent of how the word may be defined in a specific state or federal

25

statute. *Leal-Vega*, 680 F.3d at 1167. For this reason, "various courts have defined this term to include two components based on plain meaning: made (1) in imitation and (2) with intent to deceive." *Id.* (collecting cases). It makes sense to adopt the ordinary meaning of "counterfeit," as we did in *Mills*, because it is a nontechnical word whose ordinary meaning is easily discernible.

"Controlled," however, is a term of art that necessarily refers to a set of substances subject to the control of some government. *See Gonzales v. Oregon*, 546 U.S. 243, 259 (2006) ("Control is a term of art in the [Controlled Substances Act]."); *cf. Smith v. United States*, 508 U.S. 223, 241 (1993) (Scalia, J., dissenting) ("In the search for statutory meaning, we give *nontechnical words* and phrases their ordinary meaning.") (emphasis added). As a passive past participle, the word requires us to answer the question: controlled by whom? The majority attempts to provide an answer to this question by stating "the ordinary meaning" of "'controlled substance,' is '*any type of drug* whose manufacture, possession, and use is *regulated by law*.'" Maj. Op. at 8 (quoting *Controlled Substance*, BLACK'S LAW DICTIONARY (11th ed. 2019)). But that begs the question: which law? The choice is between a uniform federal definition on the one hand; or individual, inconsistent state definitions on the other.

One cannot appeal to any plain meaning of the term "controlled" to resolve this question. Unlike "counterfeit," which any ordinary person would understand to mean "fake," the word "controlled" does not stand on its own. Because *Mills* never purports to use the categorical approach, and the phrase "controlled substance" does not have a plain meaning, *Mills* does not provide the necessary support for the majority's plain meaning

26

analysis under the categorical approach.[5]   Accordingly, I cannot accept the majority's

reliance on *Mills* to support its new framework.


IV.

But let's meet the majority halfway and assume we can use the basic tools of

statutory interpretation to figure out the plain meaning of "controlled substance."  Still, the

majority makes several mistakes in its interpretive process.  For starters, the majority

appears to primarily rely on dictionaries when determining the "plain meaning" of the text.

See Maj. Op. at 5–10 (using dictionary definitions to discern the plain meaning of the

Guidelines).  But the problem with treating dictionaries as authoritative sources on a text's

plain meaning is well-documented.  *See, e.g.*, *United States v. Costello*, 666 F.3d 1040,

1043 (7th Cir. 2012) (Posner, J.) (explaining why "dictionaries must be used as sources of

statutory meaning only with great caution"); *Cabell v. Markham*, 148 F.2d 737, 739 (2d

Cir. 1945) (Hand, J.) ("Of course it is true that the words used, even in their literal sense,

---

[5] To see that *Mills* is inapposite, one need only look at several of our sister circuits that have adopted the plain meaning approach of "counterfeit," but, when construing "controlled substance," have adopted the federal definition. *Compare United States v. Robertson*, 474 F.3d 538, 540–41 (8th Cir. 2007) (adopting plain meaning of "counterfeit"), *with Sanchez-Garcia*, 642 F.3d at 661 (8th Cir. 2011) (determining whether a state conviction was a controlled substance offense under U.S.S.G. § 4B1.2(b) by asking whether the state conviction was for a drug listed in the federal schedules); *compare also United States v. Crittenden*, 372 F.3d 706, 707–10 (5th Cir. 2004) (applying plain meaning of "counterfeit"), *with United States v. Gomez-Alvarez*, 781 F.3d 787, 793 (5th Cir. 2015) (noting that under U.S.S.G. § 2L1.2, which takes the meaning of "controlled substance offense" given in § 4B1.2 and its commentary, "the government must establish that the substance underlying that conviction is covered by the CSA").

27

are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. *But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary.*") (emphasis added); *State v. Rasabout*, 356 P.3d 1258, 1271–90 (Utah 2015) (Lee, Assoc. C.J., concurring) (describing the problems with relying on a dictionary to discern the meaning of a statute and endorsing a "corpus linguistic" analysis, which looks at real-world examples).[6] Therefore, even if "controlled substance offense" did have a plain meaning, it is doubtful that the majority's overreliance on dictionary definitions would be an adequate way to discern it. Providing a few dictionary definitions of the words "controlled," "substance," and "offense," is not dispositive of the meaning of "controlled substance offense" under the Guidelines. *Cf. Yates v. United States*, 574 U.S. 528, 538 (2015) ("[A]lthough dictionary definitions of the words 'tangible' and 'object' bear consideration, they are not dispositive of the meaning of 'tangible object' in § 1519.").

In addition, the majority seems to selectively avoid applying other tools of statutory interpretation that are also instructive. Take the purpose of the Guidelines for example. Among the goals of the Guidelines is to create "reasonable uniformity in sentencing by

---

[6] *See also* Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61, 67 (1994) ("'Plain meaning' as a way to understand language is silly. In interesting cases, meaning is not 'plain'; it must be imputed; *and the choice among meanings must have a footing more solid tha[n] a dictionary*—which is a museum of words, an historical catalog rather than a means to decode the work of legislatures.") (emphasis added); A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 71, 72 (1994) ("Yet citing to dictionaries creates a sort of optical illusion, conveying the existence of certainty—or "plainness"—when appearance may be all there is.").

narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." U.S.S.G. ch. 3, pt. A1. That is, the federal Guidelines do not want courts to treat someone from Virginia more favorably than someone from West Virginia simply because they were lucky enough to commit the conduct on the right side of the border. Thus, in seeking uniformity, we have stated that "[o]ur precedent offers no basis for analyzing the laws of different sovereigns under different standards." *United States v. McCollum*, 885 F.3d 300, 306 (4th Cir. 2018).

This goal of uniformity is the reason many of our sister circuits have applied the *Jerome* presumption to the construction of the Guidelines. *See United States v. Savin*, 349 F.3d 27, 34 (2d Cir. 2003) (collecting cases). Under this presumption, "we *must* generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Jerome v. United States*, 318 U.S. 101, 104 (1943) (emphasis added). This is because "the application of federal legislation is nationwide and . . . the federal program would be impaired if state law were to control." *Id.* (internal citations omitted). Indeed, since "the administration of criminal justice under our federal system has rested with the states . . . [w]e should be mindful of that tradition in determining the scope of federal statutes defining offenses which duplicate or build upon state law." *Id.* at 105. Where, as here, there is ambiguity on how to interpret the Guidelines, federal law must be our interpretive anchor. *See Townsend*, 897 F.3d at 69 (applying the *Jerome* presumption to resolve the ambiguity of the phrase "controlled substance" in the Guidelines).

29

The majority is, of course, aware of all of this. Departing from the reasoning of other circuits, the majority sidesteps the *Jerome* presumption by declaring the language of the Guidelines makes it obvious that the federal definition of "controlled substance" does not apply. Maj. Op. at 13–14. In the majority's view, that the Guidelines "disjunctively refer[] us to state law in defining the offense" is proof that "the Commission has specified that we look to either the federal or state law of conviction to define whether an offense will qualify." Maj. Op. at 15. "In the face of these clear textual and structural expressions," the majority continues, "we cannot now cabin the career-offender enhancement." Maj. Op. at 15.

But the Guidelines' language is not as clear as the majority makes it out to be. The text of Section 4B1.2(b) of the Guidelines reads as follows:

> The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

The dispute here is whether the "controlled substance" at issue refers to substances controlled solely under state law. The dispute is not whether a state law offense could serve as a predicate controlled substance offense under § 4B1.2(b). Thus, I agree with the majority that the Commission's reference to state law means that we look to either the federal or state law of conviction to determine whether an offense will qualify. Indeed, that is why we look to Ward's conviction under Virginia Code § 18.2–250 to see if it can

30

serve as a predicate offense. If "or state law" were written out of the Guidelines, then no state conviction would be able to trigger enhancement.

But the majority's explanation for why the Guidelines should be read as clearly incorporating state law definitions of "controlled substance" does not hold up. To demonstrate clarity, the majority focuses on "[t]he context and placement of the phrase, 'controlled substance,'" asserts that it is part of "the description of the criteria for 'an offense under federal or state law,'" and concludes that this "removes any ambiguity." Maj. Op. at 16-17 n.12. That doesn't resolve the issue. Even if understood as part of the description of the criteria, the point is that there is ambiguity as to whether the descriptive content of "controlled substance" includes substances only controlled under state law. As the Second Circuit has pointed out, if the authors of the Guidelines wanted to include any substance controlled under state law, "the definition should read '. . . a controlled substance under federal or state law.'" *Townsend*, 897 F.3d at 70. It does not. Of course, "[i]t may be tempting to transitively apply the 'or state law' modifier from the term 'controlled substance offense' to the term 'controlled substance.'" *Id.* Likewise, it may be tempting to believe that "[i]f the Commission had intended for the federal definition of 'controlled substance' to apply for the career-offender enhancement, it had only to say so." Maj. Op. at 14 (internal citations omitted). But these positions undermine the presumption that federal standards govern federal sentencing provisions. "Because the Guidelines presume the application of federal standards unless they explicitly provide otherwise, the ambiguity in defining 'controlled substance' must be resolved according to federal—not state—standards." *Townsend*, 897 F.3d at 70–71.

31

Stepping back from the *Jerome* presumption, there are other reasons to think that "controlled substance" does not incorporate substances solely controlled under state law. Noticeably absent from the majority's plain meaning analysis is any consideration for the examples of "controlled substance offenses" provided in the commentary accompanying § 4B1.2(b). *Cf. United States v. Hawley,* 919 F.3d 252, 255 (4th Cir. 2019) ("[W]hen the Guidelines provide commentary that interprets a guideline provision or explains how a guideline is to be applied, the commentary is controlling[.]") (internal quotations omitted). But this commentary is instructive. For example, pointing out the clarifying language in application note 1, we previously stated:

> Section 4B1.2 *defines "controlled substances offense" to include* (1) unlawful possession of a listed chemical in violation of 21 U.S.C. § 841([c])(1); (2) unlawful possession of controlled substances manufacturing equipment in violation of 21 U.S.C. § 843(a)(6); (3) maintenance of a place for facilitating a drug offense in violation of 21 U.S.C. § 856; and (4) use of a communications facility in aid of a drug offense in violation of 21 U.S.C. § 843(b).

*Mills*, 485 F.3d at 223 (emphasis added) (citing U.S.S.G. § 4B1.2 (application note 1)).

Although this list is not exhaustive, it is informative.[7] When signifying the type of conduct

---

[7] One reason why we should not read the list as exhaustive is because such a reading would be a plainly erroneous reading of the Guidelines in that it would render the phrase "or state" superfluous in § 4B1.2. *See United States v. Allen*, 909 F.3d 671, 674 (4th Cir. 2018) ("[T]he Guidelines commentary is authoritative and controlling unless it . . . constitutes a 'plainly erroneous reading' of the Guidelines."); *see also* Maj. Op. at 16 n.11 (explaining how such a reading would render the phrase "under . . . state law" superfluous). The point, however, is that refusing to extend this section of the Guidelines to cover substances only controlled under state law does not suffer from this fatal flaw. As stated above if "or state law" was read out then no state offense would be able to trigger enhancement. On my reading, a state law offense could trigger enhancement so long as the substance is one controlled under the federal schedules.

that would trigger enhancement under Section 4B1.2, the Sentencing Commission refers exclusively to federal statutes. Yet, if the Commission wanted to include conduct solely punishable under state law, it could have been less restrictive with its illustrations. For example, the Commission could have said "[u]nlawfully possessing a prohibited flask or equipment with intent to manufacture a controlled substance" is a "controlled substance offense"—without reference to the federal statute. Likewise, the Commission could have said "[m]aintaining any place for the purpose of facilitating a drug offense" is a "controlled substance offense"—without reference to the federal statute. And so on. If the Sentencing Commission sought to include all prohibited substances under state law as qualifying controlled substances, one would expect the related commentary to be more inclusive. It is doubtful that the Commission wanted to, say, restrict the "listed chemicals" to those punishable under federal law but not restrict the "controlled substances" to those punishable under federal law. The examples in the commentary should be read as harmonious with, and complimentary to, the main text. *See Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) ("The text of § 906(c), standing alone, admits of either interpretation. But 'our task is to fit, if possible, all parts into an harmonious whole.'" (internal citation omitted)).[8]

---

[8] This position is further supported by the Commission's rationale for including the listed federal offenses as controlled substance offenses. According to the Commission, the decision was "based on the Commission's view that there is such a close connection between possession of a listed chemical or prohibited flask or equipment with intent to manufacture a controlled substance and actually manufacturing a controlled substance that the former offenses are fairly considered as controlled substance trafficking offenses." U.S.S.G. app. C, amend. 568. Rather than respect this close connection, the majority (Continued)

Without giving much weight to the reasons we have to think that "controlled substance" is not meant to incorporate substances solely punishable under state law, the majority reaches the conclusion that the enhancement could be based on the definition of "controlled substance" adopted by the state of conviction. This turns the point of the categorical approach on its head. *See Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1570 (2017) ("[T]he Government's definition turns the categorical approach on its head by defining the generic federal offense of sexual abuse of a minor as whatever is illegal under the particular law of the State where the defendant was convicted."). Whereas the categorical approach was intended to prevent inconsistencies based on state definitions of crimes, the majority's approach creates them. *Compare Taylor v. United States*, 495 U.S. 575, 588 (1990) (explaining that the enhancement provision embodies a categorical approach to avoid predicate offenses being "left to the vagaries of state law"), *with* Maj. Op. at 10 ("The state has not restricted itself to regulating only those substances listed on the federal drug schedules. Instead, the offense identifies those substances that are 'regulated' under Virginia law, which has its own drug schedules."). States often use their power to prohibit the use of substances that are not prohibited under federal law. Indeed, Virginia law, which Ward was convicted under, may contain as many as 52 substances not found on federal schedules. *See Bah*, 950 F.3d 213 (Thacker, J., dissenting) ("Petitioner provided an expert's affidavit concluding that Virginia's drug schedules contain at least 52 substances not found on federal schedules, including 42 substances on Virginia's Schedule

creates disharmony by including substances solely punishable under state law within the ambit of this Guideline provision.

I alone."). "Thus, a person imprudent enough to [manufacture, possess, or distribute these drugs in Virginia] would be found, under the [majority's view], to have committed a ["controlled substance offense"] for enhancement purposes—yet a person who did so in Michigan[9] might not." *Taylor*, 495 U.S. at 591. Something went wrong here. Rather than follow the rationale of the Supreme Court, the majority adopts the very approach *Taylor* addressed and rejected.

V.

I understand the categorical approach comes with its complications. This is part of the reason there have been consistent calls for Congress or the Supreme Court to alter the framework. *See United States v. McCollum*, 885 F.3d 300, 309 (4th Cir. 2018) (Traxler, J., concurring) ("Frankly, I would be satisfied if Congress or the Supreme Court would help us. The law in this area . . . leads to some seemingly odd results with which I do not think any of us are particularly happy."); *see also Omargharib v. Holder*, 775 F.3d 192, 200 (4th Cir. 2014) ("Were the Supreme Court willing to take another look at this area of law, it might well be persuaded, when focusing on the goals of the categorical approach, to simply allow lower courts to consider *Shepard* documents in any case where they could assist in determining whether the defendant was convicted of a generic qualifying crime." (emphasis deleted)). Hence, it makes sense why my colleagues would be tempted to apply

_____

[9] Without peering at Michigan state drug schedules, I assume here that there are at least some substances that may be controlled by Virginia that are not controlled by Michigan. But one could easily substitute these examples with different sovereigns.

a new framework that does not follow the outline that the Supreme Court supplied us with in *Taylor*. But whatever the wisdom of clinging onto the purported plain meaning of terms in the Guidelines, this Court should not rewrite the law. The majority justifies its holding on the grounds that "clear textual and structural expressions" support a reading that would require us to extend § 4B1.2(b) to cover any controlled substance a state chooses to prohibit. Maj. Op. at 14. But I fail to understand the basis for this confidence. Even if one does not accept my reading of the Guidelines, it seems to me that it must at least be acknowledged that the issue is debatable[10]—and that is enough to apply the *Jerome* presumption or respect the Commission's expressed goal for uniformity.

In any event, as explained, the best course of all would be to simply follow our precedent, apply the modified categorical approach, and affirm Ward's sentence on the basis that his conviction under Virginia Code § 18.2–250 was for distributing heroin—a substance controlled under federal schedules.

---

[10] Indeed, most of circuits that have addressed the issue have read the Guidelines different than the majority reads it today and concluded that "controlled substance" in § 4B1.2(b) refers to the federal definition. *See, e.g.*, *Townsend*, 897 F.3d at 71 (Second Circuit); *Gomez-Alvarez*, 781 F.3d at 793 (Fifth Circuit); *Sanchez-Garcia*, 642 F.3d at 661 (Eighth Circuit); *Leal-Vega*, 680 F.3d at 1166 (Ninth Circuit). *But see United States v. Ruth*,— F.3d —, 2020 WL 4045885, at *9 (7th Cir. 2020) (recognizing "the weight of authority favors" reading "controlled substance" to refer to the federal definition but deviating from this authority because of its precedent).