In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 21-2587

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER L. RAMIREZ,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:21-cr-00064 — **William C. Griesbach**, *Judge.*

_____

ARGUED SEPTEMBER 23, 2022 — DECIDED NOVEMBER 8, 2022

_____

Before RIPPLE, ROVNER, and BRENNAN, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Christopher L. Ramirez pleaded
guilty to possessing with intent to distribute fifty grams or
more of methamphetamine, in violation of 21 U.S.C.
§ 841(a)(1) and (b)(1)(B). The district court sentenced him as a
career offender under Sentencing Guideline § 4B1.1 because
he had prior felony convictions in Wisconsin for possessing
with intent to deliver tetrahydrocannabinol and for manufac-
turing or delivering cocaine. The court sentenced him to 120

months' imprisonment to be followed by eight years of supervised release.

Mr. Ramirez now appeals his sentence. He first asks us to reconsider our holding in *United States v. Ruth*, 966 F.3d 642, 651–54 (7th Cir. 2020). We held there that an offense need not involve a substance controlled by the Controlled Substances Act ("CSA"), 28 U.S.C. § 801 *et seq.*, to qualify as a predicate "controlled substance offense" for purposes of the career offender enhancement under U.S.S.G. § 4B1.1(a). He further contends that the district court failed to consider adequately and meaningfully his primary mitigating sentencing argument.

We now affirm the judgment of the district court. Mr. Ramirez has not met his burden of demonstrating that *Ruth* should be overruled. We also are convinced that the district court comprehensively evaluated the record before it and appropriately sentenced Mr. Ramirez.

# I

## BACKGROUND

In February 2021, confidential informants participated in two controlled purchases from Mr. Ramirez. The purchases tested positive for the presence of methamphetamine and fentanyl. On February 17, 2021, law enforcement officers executed a traffic stop on a vehicle operated by Mr. Ramirez. Inside the vehicle, the officers discovered a bag containing 184.79 grams of a substance that tested positive for methamphetamine and fentanyl. Investigators had observed Mr. Ramirez carrying the bag and placing it into the vehicle prior to the traffic stop.

Officers also executed a search warrant at the residence where a confidential informant had purchased methamphetamine from Mr. Ramirez. They found four firearms in a bedroom in which the owner of the residence, Mr. Ramirez's ex-girlfriend, said Mr. Ramirez resided. Another witness placed the firearms in Mr. Ramirez's possession. The witness explained that he had cleaned four firearms for Mr. Ramirez that matched the ones found during the search and that he had seen Mr. Ramirez place the firearms in the bedroom when they were returned to him on February 17, 2021. At that time, Mr. Ramirez had multiple prior felony convictions.

On March 16, 2021, a grand jury returned a four-count indictment charging Mr. Ramirez with possessing with intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) (Count One); being a felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count Two); and distributing methamphetamine and fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Counts Three and Four). Mr. Ramirez entered into a plea agreement; according to its terms, he pleaded guilty to Count One of the indictment, and the Government agreed to move to dismiss Counts Two, Three, and Four at sentencing.

Prior to sentencing, the U.S. Probation Office filed a Presentence Investigation Report ("PSR"), which detailed Mr. Ramirez's "astounding origin and upbringing."[1] Mr. Ramirez did not have a relationship with either of his parents and was raised by his grandmother, who was involved actively in the drug trade and significantly lacked as a

---

[1] R.13 ¶ 59.

positive parental figure. He explained that life in his grand-
mother's custody was "hectic," "impoverished," and "in
nearly constant survival mode."[2] He had "a first row seat to
the world of drug dealing," "was not made to attend school,"
experienced violence from his cousin and uncle, and became
involved with a street gang at age ten.[3]

The PSR described Mr. Ramirez's history of depression,
dating back to his experiences during childhood. It also re-
lated a long history of self-medication through drugs and al-
cohol. He began drinking alcohol and smoking marijuana at
around age ten and began using harder drugs, including co-
caine, acid, phencyclidine, and methamphetamine, by age
thirteen. According to the PSR, mental health professionals
had seen Mr. Ramirez briefly during previous prison stays for
situational depression and anxiety, but he now was speaking
to jail staff about his history of depression and, for the first
time, had been prescribed medications.

The PSR calculated a base offense level of 26 and added 2
levels for the possession of a dangerous weapon during the
commission of the offense to reach an adjusted offense level
of 28. The PSR then found that Mr. Ramirez met the criteria
for a career offender enhancement under U.S.S.G. § 4B1.1(a)
because (1) he was over eighteen years old at the time of the
instant offense, (2) the instant offense qualified as a controlled
substance    offense    under    U.S.S.G.    § 4B1.2(b),    and
(3) Mr. Ramirez had prior felony convictions for drug-related
offenses under Wisconsin state law. The offense level was

---

[2] *Id.* ¶¶ 60, 62.

[3] *Id.* ¶¶ 60, 63–64.

therefore increased to 34. After subtracting three levels for acceptance of responsibility, the PSR calculated a final total offense level of 31.

Taking into account Mr. Ramirez's previous criminal convictions, the PSR calculated a subtotal criminal history score of 11 and then increased the score two points because Mr. Ramirez had committed the instant offense while under the supervision of the Wisconsin Department of Corrections for previous convictions. Based on Mr. Ramirez's 13 criminal history points and his qualification as a career offender, the PSR determined that his criminal history category was VI.

The PSR explained that the maximum term of imprisonment on Count One, a Class B Felony, was forty years with a minimum mandatory term of five years. It also explained that, based upon a total offense level of 31 and a criminal history category of VI, the guideline imprisonment range was 188 to 235 months. Absent the career offender enhancement, the total offense level would have been 25, the criminal history category would have been VI, and the corresponding guideline range would have been 110 to 137 months' imprisonment.

At the sentencing hearing on August 16, 2021, the district court determined that, as set forth in the PSR, the total offense level was 31, the criminal history category was VI, and the resulting guideline range was between 188 and 235 months.[4] At

---

[4] The court overruled an objection from defense counsel regarding the two-point enhancement for firearms, concluding that the enhancement applied because § 2D1.1(b)(1) does not "require that the defendant actually use the gun or firearms during the commission of the instant offense" and that, in any event, it made "no difference to the guideline calculation

the hearing, Mr. Ramirez asked the district court to take "mercy" on him because of his upbringing.[5] He stated that he would "try to better" himself and "try to be more of a productive member of society."[6] He told the court that he had earned his high school equivalency diploma, sought mental health treatment, and been put on medication, which he had "never been open to doing in the past."[7] He urged that he was "trying to take steps now" and "wanting to change."[8]

In determining Mr. Ramirez's sentence, the court first considered the "nature and circumstances of this offense," noting that it was a "very serious offense" because "[m]ethamphetamine laced with fentanyl is a very dangerous drug" that "spread[s] poison around a community" and the amounts were "significant."[9] The court then explained that the "presence of firearms," specifically "semi-automatic handguns which are extremely dangerous," was "[a]nother aggravating factor."[10] The court also noted that Mr. Ramirez's prior history of conviction for being a felon in possession of a firearm was significant. The court then noted that Mr. Ramirez was "a

---

because Mr. Ramirez [was] a career offender under the applicable guidelines." Sent. Tr. at 5:17–6:3.

[5] *Id.* at 10:23–25.

[6] *Id.* at 11:3–4.

[7] *Id.* at 11:19–21.

[8] *Id.* at 11:22–23.

[9] *Id.* at 13:11–14:15.

[10] *Id.* at 14:16–24.

criminal history category VI by virtue of the career offender provision."[11] The court further noted that, even without the category VI designation, Mr. Ramirez's criminal history was "quite extensive" and seemed "uninterrupted from the time he was 16."[12] Indeed, noted the court, he had "almost no employment history."[13]

In its consideration of the ultimate aims of Mr. Ramirez's sentencing, the court considered his childhood and upbringing as a potential mitigating factor. Although the court noted that it often looked for "corroboration" of a defendant's account, it took Mr. Ramirez's description of his "horrendous childhood" at face value.[14] The court stated:

> If I were dealing with a young man, maybe 18, 19, 20 years old, I think the childhood—the unfortunate childhood the defendant had would carry more weight. But I'm not dealing with a young man, I'm dealing with a person who is 39 years of age. He's had multiple terms of probation with treatment ordered.
>
> And the presentence report indicates he's been assessed for alcohol/drug treatment. He's up to his … third or fourth [conviction for

---

[11] *Id.* at 15:7–8.

[12] *Id.* at 15:8–10.

[13] *Id.* at 15:11–12.

[14] *Id.* at 15:13–18.

operating a vehicle while intoxicated] or something like that.

And he certainly has a lot of other probation offenses including some violent ones against women in particular that are of concern where he simply didn't take advantage of treatment opportunities that were there. And even his most recent prison stays involved treatment that he went through but says it was of little value.

I think treatment is, of course, very important, but treatment doesn't really work until someone is able, willing, and serious about stopping their use of drugs, and it appears the defendant has not had that attitude.

I'm impressed by the defendant's allocution. It sounds sincere, but the actions here speak very loud. And the history here is one of repeated violations of the law and in frankly frightening ways.

The defendant says he wants the Court to give him a chance, but, you know, as I look at this record it consists of probation with relatively small jail terms which all look to me like they're treatment dispositions intending to have a rehabilitative effect on the defendant. And for most of his life that's what he's received. He's only received a couple of prison terms, and he left the most recent one and almost immediately

returns to the same type of behavior except per-haps on a higher level than before.

Confronted with a defendant with this type of a childhood and this type of a history, one's left with either one of two options: Either the de-fendant is incapable of changing and he is a product of his environment; or the defendant really has chosen to do—to live a life of crime. And neither one is very—is very encouraging. Both represent—or both lead to the conclusion that the defendant is a significant danger to the public and frankly his record reflects that.

I have no doubt that Mr. Ramirez is much more than a product of his environment. I'm confident that if he wanted to change, if he de-cided to change, if he made the resolve to change, he would be capable of changing.

But at this point in his life with this kind of a record at age 39, I think he's going to have to show by his behavior that he's serious about this rather than the Court assume that there's going to be a change and give him a sentence that assumes that change when it hasn't been forthcoming in the last some, what, 20 years.

So taking all these matters into considera-tion, I'm satisfied that certainly a sentence less than the guideline makes sense, but I'm not go-ing to go down to certainly five years or even eight. I'm satisfied that a sentence of 120 months, that's 10 years, is a reasonable sentence,

fair and just, considering those factors, the need, first of all, for just punishment. …

[A] significant sentence is necessary not only to reflect the seriousness of the offense, but also protect the public from further crimes of the defendant.

And lastly, of course, the need for deterrence here is strong. …

I'm satisfied that whatever rehabilitation is likely to occur is most likely to occur in prison.[15]

The court imposed a sentence of 120 months' imprisonment to be served concurrently with any other sentence Mr. Ramirez was serving, ordered eight years of supervised release, and ordered a special assessment of $100 but no fine. The other counts against Mr. Ramirez were dismissed.

Mr. Ramirez timely appealed.

## II

### A.

Mr. Ramirez first asks that we reevaluate our decision in *United States v. Ruth*, 966 F.3d 642 (7th Cir. 2020). Although he certainly would prefer that our court reverse course now, he states that he makes this argument, "[a]t a minimum, … to sufficiently preserve it for further review."[16]

---

[15] *Id.* at 16:2–19:7.

[16] Appellant's Br. 11 n.2. Our panel could change course only with the acquiescence of a majority of the judges in regular active service. *See* 7th Cir. R. 40(e).

In *Ruth*, we held that a defendant's prior cocaine conviction under Illinois law, whose definition of "cocaine" was broader than the federal definition of that substance, was nevertheless a "controlled substance offense" under the career-offender guideline. *Id.* at 651–54. We explained that "controlled substance offense" is defined broadly in the career-offender guideline and that "the definition is most plainly read to 'include state-law offenses related to controlled or counterfeit substances punishable by imprisonment for a term exceeding one year.'" *Id.* at 654 (quoting *United States v. Hudson*, 618 F.3d 700, 703 (7th Cir. 2010)). We further explained that "[a] controlled substance is generally understood to be 'any of a category of behavior-altering or addictive drugs, as heroin or cocaine, whose possession and use are restricted by law.'" *Id.* (quoting *Controlled substance*, The Random House Dictionary of the English Language (2d ed. 1987)).

In reaching this conclusion, we reasoned that it was "significant" that "the career-offender guideline, and its definition of controlled substance offense, does not incorporate, cross-reference, or in any way refer to the Controlled Substances Act," although the "Sentencing Commission clearly knows how to cross-reference federal statutory definitions when it wants to" do so. *Id.* at 651. Furthermore, although the first version of the Guidelines defined "controlled substance offense" in cross-reference to the Controlled Substances Act, the Sentencing Commission shortly thereafter "amended the definition to what is substantially, and substantively, its current form, without any cross-references." *Id.* at 652. We saw no compelling reason to import, on our own, the federal statutory definition of controlled substance. *See id.*

We also acknowledged in *Ruth* that the courts of appeals were divided on this issue, and that the weight of authority favored the defendant's view because the Second, Fifth, Eighth, and Ninth Circuits had concluded that "controlled substance" in U.S.S.G. § 4B1.2(b) referred to the federal statutory definition.[17] *See id.* at 653. We noted, however, that the other side of the split consisted of the Sixth and Eleventh Circuits, although only in unpublished opinions. *See id.* Finally, we noted that we were "not joining a side" in *Ruth* because we had "already staked out" a position in *United States v. Hudson*, 618 F.3d 700 (7th Cir. 2010). *Id.* at 654.[18]

---

[17] We explained that the Second Circuit, applying the "*Jerome* presumption" and the Supreme Court's categorical-approach cases, had concluded that federal law was "'the interpretive anchor to resolve the ambiguity' over the definition of 'controlled substance offense.'" *Ruth*, 966 F.3d at 653 (quoting *United States v. Townsend*, 897 F.3d 66, 71 (2d Cir. 2018)). *See also infra* note 26. The Fifth, Eighth, and Ninth Circuits had "applied the same basic reasoning," but had "considered a different provision of the Guidelines and a different term." *Id.* (citing *United States v. Gomez-Alvarez*, 781 F.3d 787, 793 (5th Cir. 2015); *United States v. Leal-Vega*, 680 F.3d 1160, 1166 (9th Cir. 2012); *United States v. Sanchez-Garcia*, 642 F.3d 658, 661 (8th Cir. 2011)).

[18] In *Hudson*, we addressed whether, "under the Sentencing Guidelines, … crimes involving phony versions of illegal drugs [are] properly characterized as 'controlled-substance offenses.'" *Hudson*, 618 F.3d at 701. The defendant had been "convicted of an Indiana offense related to a substance masquerading as a controlled substance, not under Indiana's law addressing counterfeit substances." *Id.* at 703. We concluded that "'look-alike' offenses constitute controlled-substance offenses for sentencing purposes." *Id.* at 701. We reasoned that "counterfeit substance," which the federal guideline does not define, should be given its "natural meaning" rather than limiting it "to a particular state's concept of what is meant by that term." *Id.* at 703–05. Therefore, "[v]iewed broadly, what [the

We recently declined to overrule *Ruth* in both *United States v. Wallace*, 991 F.3d 810 (7th Cir. 2021), and *United States v. McLain*, 849 F. App'x 590 (7th Cir. 2021).[19]

Although we have said that "[p]recedents are not sacrosanct," *Buchmeier v. United States*, 581 F.3d 561, 565 (7th Cir. 2009) (en banc), there can be no doubt that the doctrines of stare decisis and precedent remain, as Justice Cardozo put it, "the everyday working rule of our law."[20] There must be a serious justification for our overruling a settled precedent. To ensure that we adhere to this standard, we have articulated three guideposts to alert us to situations that might justify overruling circuit law: (1) "when the circuit is an outlier and can save work for Congress and the Supreme Court by eliminating a conflict," (2) when the overruling "might supply a new line of argument that would lead other circuits to change their positions in turn," and (3) "when prevailing doctrine

---

defendant] sold could be seen as a 'counterfeit' version of an illegal drug." *Id.* at 703.

[19] *See also, e.g.*, *United States v. Dill*, No. 21-2672, 2022 WL 2188533, at *2 (7th Cir. June 17, 2022); *United States v. Sisk*, No. 20-2493, 2021 WL 4314062, at *1 (7th Cir. June 23, 2021); *United States v. Carter*, No. 20-2520, 2021 WL 3674654, at *1 (7th Cir. May 6, 2021); *United States v. Atwood*, No. 20-2794, 2021 WL 6337482, at *1 (7th Cir. Apr. 30, 2021); *United States v. Gordon*, No. 20-3096, 2021 WL 3674652, at *1 (7th Cir. Apr. 16, 2021). *Ruth* continues to be cited as the accepted law of this circuit. *See, e.g.*, *United States v. Harris*, No. 21-1405, 2022 WL 7880843, at *7 (7th Cir. Oct. 14, 2022); *United States v. Moore*, 50 F.4th 597, 601 (7th Cir. 2022). The parties refer to the precedent that Mr. Ramirez seeks to overturn as either *Ruth* or *Ruth* and *Wallace*. For simplicity, we refer to the relevant precedent only by the initial case, *Ruth*.

[20] Benjamin N. Cardozo, *The Nature of the Judicial Process* 20 (1921).

works a substantial injury." *Id.* at 566; *United States v. Thomas*, 27 F.4th 556, 559 (7th Cir. 2022).

The ongoing dialogue among the courts of appeals, as various courts join one side or the other of an existing split in authority, places special responsibilities upon the participating courts. The doctrines of stare decisis and precedent remain the working rule of the law. But we also must remember that "[t]here is no element of sovereignty in a federal judicial circuit"[21] and that we have a continuing responsibility to consider thoughtfully and respectfully the subsequent decisions of our sister circuits and state supreme courts when those decisions present new arguments that we did not consider when the issue was before us. Even then, as we noted in *Buchmeier*, there may well be, in some instances, institutional concerns that counsel against our reconsidering our view. *See Buchmeier*, 581 F.3d at 566. But we must never forget that the "percolation" of an issue among the lower courts often produces new perspectives or significant refinement of what has been said before.[22] In that situation, our role in the constant dialogue among the Nation's appellate courts[23] and our responsibility to the litigants before us requires us to have the

---

[21] Walter V. Schaefer, *Reducing Circuit Conflicts*, 69 A.B.A. J. 452, 454 (1983).

[22] *See Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1782 (2019) (per curiam); *id.* at 1784 (Thomas, J., concurring); *California v. Carney*, 471 U.S. 386, 398 n.8, 400 n.11 (1985) (Stevens, J., dissenting). *See generally* Michael Coenen & Seth Davis, *Percolation's Value*, 73 Stan. L. Rev. 363 (2021).

[23] This dialogue often involves state supreme courts as well. *See* Sup. Ct. R. 10(b).

judicial humility to reconsider our previous course. "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat'l Bank & Tr. Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).

Here, Mr. Ramirez asks that we overturn *Ruth* and its progeny. As we already have noted, those cases concerned the "career offender" provision of the United States Sentencing Guidelines.[24] Under § 4B1.1(a) of the United States Sentencing Guidelines, a defendant is a "career offender" if:

> (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

The Guidelines define a "controlled substance offense" as

> an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a

---

[24] In *Ruth*, we also held that the defendant's prior Illinois cocaine conviction was not a qualifying "felony drug offense" under 21 U.S.C. § 841(b)(1)(C) that would enhance his sentence and that the district court's erroneous conclusion to the contrary affected the defendant's substantial rights because the 21 U.S.C. § 851 enhancement increased his Guidelines range. *See Ruth*, 966 F.3d at 645–50.

counterfeit substance) with intent to manufac-
ture, import, export, distribute, or dispense.

U.S.S.G. § 4B1.2(b).

Mr. Ramirez submits that two reasons articulated in *Buch-meier* counsel overturning *Ruth*—namely, (1) that the Seventh Circuit is an outlier and can save work for Congress and the Supreme Court by eliminating a conflict and (2) that the Seventh Circuit's prevailing doctrine works a substantial injury. In response, the Government maintains that none of the *Buch-meier* reasons supports our changing course.

A well-recognized circuit split exists on this issue. Justice Sotomayor's statement accompanying a denial of certiorari in *Guerrant v. United States*, 142 S. Ct. 640 (2022), which Justice Barrett joined, described the circuit split as follows:

> The Second and Ninth Circuits have turned to federal law to define the term: In those Circuits, a defendant has committed a controlled substance offense only if the offense involved a substance listed in the Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.* See *United States* v. *Bautista*, 989 F.3d 698, 702–704 (CA9 2021); *United States* v. *Townsend*, 897 F.3d 66, 68, 71 (CA2 2018). The First and Fifth Circuits have not directly resolved the question, but have indicated agreement with this approach. See *United States* v. *Crocco*, 15 F.4th 20, 23–25 (CA1 2021) (describing reference to federal law as "appealing" and reference to state law as "fraught with peril"); *United States* v. *Gomez-Alvarez*, 781 F.3d 787, 792–794 (CA5 2015) (relying

on the CSA to interpret the term "controlled substance" in USSG § 2L1.2). In contrast, the Fourth[,] … Seventh, Eighth, and Tenth Circuits[] define[] what qualifies as a "controlled substance" based on the relevant state law. See *United States* v. *Jones*, 15 F.4th 1288, 1291–1296 (CA10 2021); *United States* v. *Henderson*, 11 F.4th 713, 718–719 (CA8 2021); *United States* v. *Ward*, 972 F.3d 364, 371–374 (CA4 2020); *United States* v. *Ruth*, 966 F.3d 642, 651–654 (CA7 2020). Defendants in those Circuits therefore qualify as career offenders for federal sentencing purposes even if their only prior offenses involved substances not prohibited under federal law. As a result, they are subject to far higher terms of imprisonment for the same offenses as compared to defendants similarly situated in the Second or Ninth Circuits. … The Sixth and Eleventh Circuits have issued internally inconsistent decisions on the question. See *United States* v. *Solomon*, 763 Fed. Appx. 442, 447 (CA6 2019) (noting inconsistency in past opinions); *United States* v. *Stevens*, 654 Fed. Appx. 984, 987 (CA11 2016) (federal law); *United States* v. *Peraza*, 754 Fed. Appx. 908, 909–910 (CA11 2018) (state law).

*Guerrant*, 142 S. Ct. at 640.[25]

---

[25] In their *Guerrant* statement, Justices Sotomayor and Barrett stated that "[i]t is the responsibility of the Sentencing Commission to address this division to ensure fair and uniform application of the Guidelines." *Guerrant*, 142 S. Ct. at 640–41. The Sentencing Commission has stated that one of its priorities for the amendment cycle ending May 1, 2023, is to resolve the

Our position plainly does not make us an outlier. Since our decision in *Ruth,* the Fourth, Eighth, and Tenth Circuits have taken the same view. *See United States v. Jones*, 15 F.4th 1288, 1291–96 (10th Cir. 2021); *United States v. Henderson*, 11 F.4th 713, 717–19 (8th Cir. 2021); *United States v. Ward*, 972 F.3d 364, 370–74 (4th Cir. 2020). These courts have agreed with us that the plain language of U.S.S.G. § 4B1.2(b) refers to state as well as federal law and that the lack of cross-references to the Controlled Substances Act, when the Sentencing Commission clearly knew how to cross-reference federal definitions elsewhere in the Guidelines, counsels against importing that statute's definition of "controlled substance." *See Jones*, 15 F.4th at 1292–93; *Henderson*, 11 F.4th at 718–19; *Ward*, 972 F.3d at 369–73. The Fourth Circuit set out a particularly thorough textual analysis. *See Ward*, 972 F.3d at 370–71.

Notably, in deciding the issue, the Fourth, Eighth, and Tenth Circuits have articulated additional points, not specifically addressed in *Ruth*, that further support our position. They have demonstrated, for instance, that the presumption from *Jerome v. United States*, 318 U.S. 101, 104 (1943),[26] does not

---

circuit split concerning whether an offense must involve a substance controlled by the Controlled Substances Act to qualify as a "controlled substance offense" under § 4B1.2(b). *See Federal Register Notice of Final 2022–2023 Priorities*, U.S. Sent'g Comm'n, https://www.ussc.gov/policymaking/federal-register-notices/federal-register-notice-final-2022-2023-priorities; Proposed Priorities for Amendment Cycle, 87 Fed. Reg. 60,438 (Oct. 5, 2022).

[26] Under the *Jerome* presumption, courts "generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Jerome*, 318 U.S. at 104.

require defining "controlled substance" by reference to the Controlled Substances Act.[27] These courts have explained that the *Jerome* presumption is overcome by the plain language, disjunctive reference in § 4B1.2(b) to "federal or state law," *see Jones*, 15 F.4th at 1292; *Ward*, 972 F.3d at 374, and by Congress's intent as evidenced in 28 U.S.C. § 994(i)(1), which directs the Sentencing Commission to fashion guidelines that enhance the sentence of a defendant who has "a history of two or more prior Federal, State, or local felony convictions," *see Henderson*, 11 F.4th at 719; *see also Jones*, 15 F.4th at 1296. These courts also have expressed some reservation as to whether the *Jerome* presumption applies at all to the interpretation of the Sentencing Guidelines. *See Henderson*, 11 F.4th at 719; *Ward*, 972 F.3d at 374.[28]

The Tenth Circuit also has addressed arguments that we have not yet considered about the relevant enabling statute and national uniformity. The Tenth Circuit rejected an argument that the relevant enabling statute, 28 U.S.C. § 994(h),[i] limits the term "controlled substance" in § 4B1.2(b) to substances listed in the Controlled Substances Act. It explained

---

[27] We acknowledged in *Ruth* that the Second Circuit had relied on the *Jerome* presumption to reach its conclusion that the definition of "controlled substance" should come from federal law, but we did not directly address the *Jerome* presumption in reaching our own conclusion. *See Ruth*, 966 F.3d at 653 (citing *Townsend*, 897 F.3d at 71).

[28] The Eighth Circuit noted that "the Supreme Court has rarely cited *Jerome* and never to [its] knowledge in a Guidelines case." *Henderson*, 11 F.4th at 719. The Fourth Circuit concluded that, "[a]ssuming the *Jerome* presumption should be applied to Guidelines promulgated by the Sentencing Commission, [the court was] confident that it [was] overcome here." *Ward*, 972 F.3d at 374.

that "the statutory language requires the Commission to pro-
vide a career-offender enhancement for violations involving
drugs prohibited by the CSA, but it does not strip the Com-
mission of its authority to include drug offenses that are not
violations of the CSA as predicate crimes for a career-offender
enhancement." *Jones*, 15 F.4th at 1294. Responding to argu-
ments concerning national uniformity, the Tenth Circuit con-
cluded that "disregarding *any* conviction under a state's cate-
gorically broader, indivisible drug-offense statute in deter-
mining whether to enhance a defendant's sentence arguably
undermines national uniformity in sentencing more than con-
sidering *all* state-law convictions under indivisible or divisi-
ble statutes, though some convictions might involve non-
CSA-listed substances." *Id.* at 1296. In short, since our decision
in *Ruth*, our position has gained, not weakened, as the dia-
logue among the circuits has continued.

Mr. Ramirez still attempts, however, to portray us as an
outlier because, although we recognize the split, we have not
addressed explicitly the competing side's arguments. He
chides us for claiming that we were not "joining a side" of an
existing split, but rather were applying related case law.[29] He
also notes that the existence of "dissent within courts that
agree with the reasoning in *Ruth*" shows that those circuits
"are far from being firmly entrenched there."[30]

These arguments are unpersuasive. Our statement in *Ruth*
that we were not "joining a side" merely indicated that our
reasoning already had been explained in *Hudson*, 618 F.3d at

---

[29] Reply Br. 2.

[30] *Id.* at 4–7.

703–05. Our decision not to respond directly to the reasoning of courts on the other side of the split in *Ruth* has no bearing on whether our position is that of an outlier. Moreover, even if *Ruth* had been an outlier in the circuit split when it was first decided, Mr. Ramirez acknowledges that Justice Sotomayor's formulation of the split, in which this court is plainly not an outlier, is currently the best identification of the circuit split on this issue.

Mr. Ramirez also submits that, under *Buchmeier*, reconsideration of *Ruth* is justified because this court's position "causes substantial, disparate injury to people tried in federal courts within this Circuit."[31] The injury that Mr. Ramirez alleges seems best characterized as the unfairness that, as noted by Justices Sotomayor and Barrett, defendants in this circuit and the other circuits that take the same position "are subject to far higher terms of imprisonment for the same offenses as compared to defendants similarly situated in" circuits on the other side of the split. *Guerrant*, 142 S. Ct. at 640. Although this situation is undoubtedly one in need of reconciliation by the Supreme Court or the Sentencing Commission, it is not the sort of "substantial injury" that we envisioned would justify the reconsideration of precedent. *See Buchmeier*, 581 F.3d at 566. As the Government suggests, until the conflicting views of the circuits are reconciled, "it could just as easily be argued that *undercounting* career offenders works a substantial injury by failing to protect the public from recidivist drug criminals."[32]

---

[31] Appellant's Br. 14.

[32] Appellee's Br. 15 n.5.

Mr. Ramirez raises two other points that he believes require reconsideration of our position in *Ruth*. He submits that the *Jerome* presumption provides that "federal, not state, legal standards apply to federal sentencing provisions."[33] However, it is clear that we were aware of the *Jerome* presumption when we decided *Ruth*. *See Ruth*, 966 F.3d at 653. Mr. Ramirez also submits that "interpreting the definition of 'controlled substance' in the Guidelines in accordance with federal law promotes uniformity in federal sentencing law and with respect to Guidelines ranges."[34] However, we were aware of the circuit split at the time we decided *Ruth*.

For the foregoing reasons, we conclude that Mr. Ramirez has not demonstrated that *Ruth* should be overruled.

**B.**

Mr. Ramirez also submits that the district court did not consider adequately and meaningfully his primary mitigating sentencing argument.

We have considered previously claims that a district judge did not address adequately a defendant's principal mitigation argument. We have said that we simply "cannot have much confidence in the judge's considered attention to the [relevant] factors" when the judge "passe[s] over in silence the principal argument made by the defendant even though the argument was not so weak as not to merit discussion." *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). The district court, therefore, "must give meaningful consideration to

---

[33] Appellant's Br. 13.

[34] *Id.*

the characteristics of the defendant that might bear on the appropriate length of a sentence and explain how those characteristics influenced the sentence the court chose." *United States v. Patrick*, 707 F.3d 815, 818 (7th Cir. 2013) (citing *Rita v. United States*, 551 U.S. 338, 357 (2007); *United States v. Miranda*, 505 F.3d 785, 792 (7th Cir. 2007); *Cunningham*, 429 F.3d at 678). The district court satisfies this standard when it "makes an adequate, thoughtful analysis of the sentencing factors vis-à-vis the facts of the case, and … makes it clear, on the record, that in reaching the final sentence, [it] has *considered* the applicable sentencing factors, and the arguments made by the parties." *United States v. Collins*, 640 F.3d 265, 271 (7th Cir. 2011).

On several occasions, we have concluded that a district court, in the course of making a sentencing decision, failed to consider a mitigating argument in a meaningful way. In *United States v. Cunningham*, for example, we vacated and remanded for resentencing because the district court gave an inadequate explanation for the sentence. *See Cunningham*, 429 F.3d at 680. We specifically noted that two related problems undermined our confidence in the sentence. First, the district court had stated that the defendant decided not to cooperate against a co-defendant but made no inquiry into the cause and significance of the defendant's decision not to cooperate. *See id.* at 677. Second, the district court did not mention the defendant's "psychiatric problems and substance abuse, which [the defendant]'s lawyer wove into a pattern suggestive of entrapment … as a mitigating factor not reflected in the guidelines and also as a basis for [his] being given a sentence different from a straight prison sentence." *Id.* at 678.

In *United States v. Miranda*, 505 F.3d 785, 786 (7th Cir. 2007), we similarly vacated and remanded for resentencing. The

defendant there had argued that his severe mental illness, and in particular his diagnosis of schizoaffective disorder, reduced the need for deterrence, made incapacitation by imprisonment less appropriate, and rendered him less deserving of punishment. *See id.* at 792. We concluded that "[a]lthough the district court mentioned [the defendant]'s mental illness, the court did not specifically address [his] principal, non-frivolous arguments based on these section 3553(a) factors." *Id.* We therefore lacked confidence that the district court "gave these arguments adequate consideration." *Id.* at 792–93.

We also remanded for resentencing in *United States v. Patrick*, 707 F.3d at 820, in which the district court's very brief mention of the defendant's mitigating argument based on cooperation "shed[] little if any light on the judge's thinking" and also did not allow this court "to discern whether the [district] court appreciated the severity of the sentence it imposed, and in particular its equivalence to the life sentence that it had purportedly rejected."

Mr. Ramirez first submits that, like the district court in the above cases, the district court "failed to adequately consider" his "extensive history of trauma, in breadth, variety, and duration, [which] was surely a compelling, multi-layered mitigating argument for a lower sentence."[35] As Mr. Ramirez views the matter, the district court erred in "merely touch[ing] upon" his "long-standing struggles with substance abuse" and in not discussing the physical abuse he suffered or his "mental health struggles that appear to be at the core of

---

[35] *Id.* at 30.

his reoccurring, relapsing drug and alcohol use."[36] Mr. Ramirez sees his situation as analogous to the one in *Miranda* and submits that, "given the extent of information about the nature of his near-unspeakable upbringing," and its impact on his mental health, controlled substance use, and other areas of his life, the district court had "to do more to assure that it adequately considered a significant argument in mitigation."[37]

We cannot accept this argument. As we noted earlier, unlike the situation in *Miranda*, the district court did address, explicitly and extensively, Mr. Ramirez's principal mitigating argument about his upbringing, including in reference to the factors and goals of sentencing.[38]

Mr. Ramirez also submits that the district court rejected his primary mitigating argument because it had incorrect and incomplete information about him. Specifically, Mr. Ramirez argues that the district court had no clear basis for concluding that Mr. Ramirez was effectively "too old" to justify a focus on his childhood and that he had failed to take advantage of prior opportunities to mend his ways.[39] He invites our attention to the district court's statement that he previously had received only "relatively small jail terms which all look[ed] … like … treatment dispositions intending to have a

---

[36] *Id.* at 32.

[37] *Id.* at 33–34.

[38] *See supra* pp. 7–10.

[39] Appellant's Br. 30.

rehabilitative effect," and argues that he had not, in fact, failed to complete any effective rehabilitative treatment offered to him.[40]

Read in context, however, the district court's statement simply makes the point that over the course of his long criminal history, Mr. Ramirez had received probationary sentences and not many long prison sentences. Despite this leniency, he had not changed the course of his life. The district court deemed this factor to be relevant to an estimation of Mr. Ramirez's ability and willingness to change his ways.

We have reviewed the sentencing proceeding and the information available in the record concerning Mr. Ramirez's sentence. The district court was on solid ground in determining that Mr. Ramirez was not a good candidate for leniency and posed a significant danger to the community.

### CONCLUSION

The judgment of the district court is affirmed.

AFFIRMED

---

[i] Section 994(h) of Title 28 of the United States Code requires that the Guidelines

> specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and—
> (1) has been convicted of a felony that is—
> (A) a crime of violence; or

---

[40] *Id.* at 30–31.

(B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46; and

(2) has previously been convicted of two or more prior felonies, each of which is—

(A) a crime of violence; or

(B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46.